# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RONALD R. PETERSON, as Chapter 7 Trustee for Lancelot Investors Fund, L.P.,** *et al.* **and MAA, LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**HANS IMHOF, THE RUSSELL ELDON HATLE AND LORRAINE LOUISE HATLE REVOCABLE TRUST, THE L. HATLE TRUST, DATED DECEMBER 30, 1991, KENNEDY FUNDING, INC., JEFFREY WOLFER, KEVIN WOLFER, AND GREGG WOLFER.**<br><br>Defendants. | Docket No.: 13-cv-0537<br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

This bankruptcy and contract matter involves an 11-count complaint and 5 crossclaims. In October 2007, Defendant Kennedy Funding, Inc., ("Kennedy"), a loan originator and servicing entity owned and operated by the Wolfer Defendants ("the Wolfers"), agreed to loan roughly $47 million to Defendant Clearwater Development ("Clearwater"), to be used for developing a golf course(s) in Colorado. The Loan Documents list Kennedy as "Agent" for a group of to-be-determined co-lenders, and use "Lender" to refer to "Agent and lenders . . . collectively." The Loan was secured by a $23 million Guaranty by Defendants Imhof, Marvin, and Hatle Trusts ("Guarantors") and collateralized by certain parcels of land in Colorado. Importantly, the Loan Documents authorized Kennedy to modify or release the Guarantors from their Guaranty obligations upon obtaining a majority consent of the co-Lenders, who at the time were either nonexistent or simply not listed in the contract, but whose existence and participation were likely anticipated by both Kennedy and the Guarantors.

1

Several weeks later, in November 2007, Defendant Kennedy organized and executed a Co-Lenders Agreement ("CLA"). The CLA allocated roughly 54% interest in the Loan to Kennedy and 43.5% of the Loan to Plaintiff KD8 ("KD8").[1] KD8 is now represented by its bankruptcy Trustee, Ronald Peterson ("Trustee" or "Plaintiff")[2]. Unlike the original Loan Documents, the CLA required 100% consent from Co-Lenders in order to release the Guarantors. After Clearwater defaulted on the loan in 2009, Kennedy executed—without the consent of KD8, which the CLA required—a Modification Agreement with Guarantors which released the Guarantors from their $23 million obligation in exchange for $500,000 up front and $3,000,000 in expenses to physically maintain the collateral real estate over the following two years. The validity and effect of the Modification and Release between Kennedy and Guarantors (at the alleged detriment of Trustee) are central to this litigation.

Four motions now come before the Court. First, Trustee moves for summary judgment on all eleven Counts. Second, Guarantors have filed a competing motion for summary judgment on Counts 1 through 4. Third, Guarantors move to strike two declarations supporting Plaintiff's motion for summary judgment. Fourth, the Wolfer Defendants move for summary judgment to dismiss Guarantors' Crossclaims 1 through 5 against them as individuals, arguing that alter ego liability does not apply.

For the reasons below, Plaintiffs' motion for summary judgment is **GRANTED in part and DENIED in part**; the Guarantors' motion for summary judgment is **DENIED**; the Guarantors' motion to strike the Declarations of Ronald R. Peterson and Daniel Dooley is **DENIED**; and the Wolfers' motion for summary judgment is **DENIED**.

I. <u>BACKGROUND</u>

Facts are drawn from the pleadings and, where appropriate, the parties' motion papers.

**A. The Parties**

Plaintiff Ronald R. Peterson ("Trustee") is the Chapter 7 Trustee for Lancelot Investors Fund, a group of entities that includes KD8.

KD8, LLC ("KD8") is an investment entity that agreed via the Co-Lenders Agreement with Defendant Kennedy to provide 43.53% of funding to Clearwater under the Loan Documents.

---

[1] The remaining 3 percent was distributed among JKG Financing Inc., DBP ("JKG) (2%), Sharon Berger (.50%), and WVM Group, LLC (.50%). Signatory for JKG was Joseph Wolfer, founder of Kennedy and father of the Wolfer Defendants, who no longer has any formal involvement with Kennedy. *See infra* K. Wolfer Depo. 52:1-11.

[2] Trustee and KD8 are treated as identical for purposes of this Opinion.

Defendant Kennedy Funding, Inc. ("Kennedy") is an entity that funds and facilitates real estate projects. It is listed in the Loan Documents as "agent for the lenders." Kennedy agreed in the CLA to fund roughly 53% of the Loan to Clearwater.[3] Declaration of Eve A. Brackmann, ("Brackmann Decl."), Ex. 16 at 1, ECF No. 161-15.

Plaintiff MAA, LLC ("MAA") replaced Kennedy as Agent for the co-lenders, pursuant to the Amended Co-Lenders Agreement dated October 22, 2013. The Amended CLA, which authorized MAA to intervene as a plaintiff in this litigation, was approved by order of the United States Bankruptcy Court for the North District of Illinois on August 22, 2013. *In re Lancelot Investors Fund, L.P. et al.*, No. 08-28225, Doc. 1290. (Bankr. N.D. Ill. 2013).

Defendants Kevin Wolfer, Jeffrey Wolfer and Gregg Wolfer (the "Wolfers") occupied management roles at Kennedy at times relevant to this litigation. Kevin and Gregg each currently own 50% of Kennedy Funding. In January 2014, Plaintiffs agreed pursuant to Federal Rule 41 (a)(1)(A)(ii) to dismiss with prejudice all claims against the Wolfers as individuals, though not against Kennedy. *See* Letter from Sharon L. Levine, ECF No. 99. Judge Cavanaugh's Order did not impair Guarantors' Crossclaims against the individual Wolfers Defendants, which the Wolfers now seek to dismiss on summary judgment. ECF No. 100.

Defendant Clearwater Development, Inc. ("Borrower" or "Clearwater") agreed under the Loan Agreement to borrow up to $47 million from Kennedy and other lenders, including Plaintiff KD8 (now represented by Trustee). The money was to be used for Clearwater's development of golf courses.

Defendants Hans Imhof, Wells L. Marvin, Hatle Trusts ("Guarantors") are individuals who guaranteed $23 million of the Clearwater loan.

## B. The Original Clearwater Loan Documents

On October 26, 2007, Defendant Kennedy entered into a Loan and Security Agreement (the "Loan Agreement" or "Loan") with Defendant Clearwater. Clearwater executed a $47,142,500 promissory note (the "Note") in favor of Kennedy. The Loan was secured by a $23 million guaranty agreement (the "Guaranty") from Hans Imhof, Wells L. Marvin, Hatle Trusts ("the Guarantors"), the exclusive shareholders of Clearwater Development. *See* Brackmann Ex. 1, Loan Agreement ¶ (h). The Loan was further secured by collateral described in Schedule A of the Agreement, namely, eleven parcels of land

---

[3] To clarify, Kennedy Funding, Inc. agreed to lend 6.44% of the Loan, while an entity called "KD Originator" agreed to provide 43.53% of funding. CLA ¶ 1. However, signatory for both Kennedy and KD Originator was Kevin Wolfer, Kennedy's principal, and the parties effectively treat KD Originator as part of Kennedy for purposes of this litigation. *See* CLA Ex. C.

comprising the Brightwater Golf Club in Eagle County, Colorado. *Id.* at Schedule A, Exhibit A.

The Loan Agreement, Guaranty and Note are referred to herein as the "Loan Documents" unless stated otherwise. The Loan Agreement begins with the following paragraph:

> THIS LOAN AND SECURITY AGREEMENT ("Agreement"), dated as of October 26, 2007, between Clearwater Development, Inc., . . . and KENNEDY FUNDING, Inc. ("Agent"), having an address at Two University Plaza, Suite 302, Hackensack, New Jersey 07601, *as agent for the lenders identified on Schedule D* attached hereto and incorporated herein by reference, in each case having an address care of Kennedy Funding, Inc. . . . (the aforesaid Agent and lenders are hereinafter *collectively referred to as "Lender"*).

Brackmann Decl. Ex. 1 (emphasis added). Schedule D was blank at the time the documents were signed, and was never explicitly amended. In other words, there were never any lenders (other than Kennedy itself) formally listed in the original Loan Agreement, although both parties understood that additional lenders would participate by purchasing interest in the Loan from Kennedy.

### C. The Co-Lenders Agreement Between Kennedy, KD8 and other Lenders

Several weeks later, in November 2007, Kennedy entered into the Co-Lenders Agreement (the "CLA") with a group of lenders, including newly formed investment vehicle Plaintiff KD8.[4] The CLA provides that "[e]ach Lender shall own an undivided fractional interest in the Loan, in its respective Lender's Percentage, and in all documents, instruments and collateral issued by the Borrower or the Guarantors." Brackmann Decl. ¶ 4, CLA ¶ 2. The CLA was demonstrably predicated on the Loan Documents already executed by Kennedy, Clearwater and the Guarantors. KD8, agreeing under the CLA to fund 44% of the Loan, thence became part of the collective "Lender" in the underlying Loan Agreement with Clearwater and Guarantors. Paragraph 11 of the CLA reads that, "To the extent not already set forth therein, Schedule D to the Loan Agreement . . . shall be amended and restated to specifically set forth the Lender's Percentage of each lender which holds a portion of the Loan." *See* Brackman Decl. Ex. 4, CLA ¶ 11. Unfortunately, the parties neglected to actually amend Schedule D of the Loan Agreement to reflect the participation of KD8 and the other lenders. Guarantors, not a party to the CLA, claim they were unaware of the CLA or of KD8's participation in the Loan until much later. Nonetheless, the Loan Documents appear to give Kennedy the right to add lenders (or agents) without consent or notification of Guarantors. *See* Loan Agreement ¶ 20(h).

---

[4] KD8 apparently formed sometime during the weeks between execution of the Loan Agreement and execution of the CLA.

### D. Clearwater Default; Modification of the Loan Documents; and Conflicting Consent Provisions

Clearwater has been in default on the Loan since January 2009.[5] At that point, Kennedy, as "agent for the lenders" under the original Loan Documents, began negotiating with Clearwater and Guarantors about modifying the Loan. *See* J. Wolfer Dep. 23:3-10. In July 2009, Kennedy agreed to a modification of the Loan ("Loan Modification" or the "Modification") that released the Defendant Guarantors from their $23 million obligation in exchange for $500,000 and a promise to spend a total of $3 million over the following two years ("Maintenance Term") to physically maintain the collateral real estate, so as to preserve its value. *See* Brackmann. Decl., Ex. 19. When deposed, Defendant Jeffrey Wolfer, Principal of Kennedy, explained that "things were falling apart in the world at the time and we were trying to do whatever we could to salvage the collateral the best we could knowing the bank was not going to put up the money and the co-lenders were not putting up the money." Defs. Statement of Material Facts, ¶ 128.

Trustee, standing in KD8's place, argues that the Modification is invalid because, pursuant to the CLA consent provision, Kennedy lacked authority to release the Guarantors without Trustee's consent. On the issue of lender consent to modification, the original Loan Agreement and the Co-Lenders Agreement conflict. The Loan Agreement, between Guarantors and Kennedy (as "agent of the lenders"), required that Kennedy obtain consent of lenders holding at least 50% interest in the Loan. *See* Brackmann Decl. Ex. 1, Loan Agreement ¶ 20(d). Meanwhile, the CLA—between Kennedy, KD8 and other lenders— required Kennedy to obtain unanimous consent from all lenders to release Guarantors' $23 million liability. *See* Brackmann Decl. Ex. 4, CLA ¶ 6. Plaintiff KD8 was the only lender not to consent, and it is unclear whether Kennedy attempted to obtain KD8's consent. *See* Defendants' Reply to Plaintiff's Rule 56.1 Statement of Facts ¶ 100. In short, although Kennedy complied with the Loan Agreement's consent requirement, it ostensibly violated the unanimous consent provision of the CLA.

Trustee argues that, if the Modification is valid, Guarantors nonetheless failed to satisfy its terms, leaving in effect the Guarantors' $23 million obligation under the original Loan Documents. Specifically, Trustee alleges that Guarantors failed to spend $3 million maintaining the collateral property, and instead allowed the property to fall into disrepair. Guarantors respond that the Modification is valid since Kennedy obtained majority consent pursuant to the Loan/Guaranty documents, and argue that Guarantors substantially performed those obligations of the Modification upon which their release was contingent. Guarantors provide documentation of expenses relating to maintenance of the collateral property, but the contents and meaning of those documents are disputed by the parties on various grounds, which are more suitable for resolution at trial.

---

[5] Clearwater ultimately filed for bankruptcy in April 2011. *See* SAC ¶ 35.

### E. Trustee's Knowledge of the Modification and Release

Several key defenses asserted by Defendants—laches and the inapplicability of equitable tolling of statutory limitations—hinge on when Trustee learned that the Guarantors had been released. During depositions, Trustee and his lawyer, Larry Swibel, insisted that Trustee was unaware of the release until August 2011. *See* Brackmann Decl., Ex. 29, Swibel Dep. 91:9-92:16; Brackmann Decl., Ex. 25, Peterson Dep. 77:13-78:14. Defendant Jeffrey Wolfer, then president of Kennedy, alleges that he discussed the Loan with Trustee on multiple occasions between October 2008 and February 2010, but that he could not recall details of those conversations. *See, e.g.* Brackmann Decl., Ex. 7, J. Wolfer Depo. 131:19-132:2. Trustee admits that in 2009 he occasionally received email updates from Kennedy about the collateral property. *See* Peterson Dep. 66:13-68:16. Trustee and Mr. Swibel received a memorandum in August 2009 from Kennedy discussing aspects of the Modification agreement, though neither remembers actually reading the memorandum. *See* Peterson Dep. 69:15-22. Moreover, the memorandum did not explicitly mention releasing Guarantors from their original obligations. *See* Brackmann Decl. Ex. 80. Guarantors argue that, at absolute latest, Trustee learned of the Modification and release on January 14, 2010, when Trustee and Mr. Swibel received additional emails from Kennedy regarding the status of the Clearwater Loan. *See* Defs.' Statement of Facts in Support of Summary Judgment, ¶¶ 177-180. In short, when Trustee learned of the release remains a disputed question of material fact.

### F. Procedural History

Trustee filed a complaint against Defendants in United States Bankruptcy Court for the Northern District of Illinois on April 27, 2012, claiming that Kennedy lacked authority to modify the Loan Documents without Trustee's consent. The action was withdrawn to District Court for the Northern District of Illinois. On January 8, 2013, Judge James B. Zagel granted Plaintiff's motion to transfer venue to the District Court for the District of New Jersey. ECF. No. 49.[6]

Trustee filed an amended complaint ("FAC") on March 8, 2013, alleging contract and bankruptcy claims. On August 22, 2013, Judge Cavanaugh approved a stipulation to dismiss with prejudice all of Plaintiffs' claims against the individual Wolfer Defendants, without affecting the Guarantors crossclaims against the Wolfers.[7] ECF. 99. On October 8, 2013, Judge Cavanaugh denied Guarantor's motion to dismiss and held that discovery would be necessary to determine whether the two-year statute of limitations on Trustee's

---

[6] Bankruptcy proceedings for KD8 and its parent company, Lancelot Investors, continue to proceed in Illinois.

[7] The Stipulation for dismissal of claims against the individual Wolfers evidently resulted from a "compromise" between the Wolfers and the Trustee in connection with the Amended Co-Lenders agreement, in which Kennedy Funding agreed to cede its position as Agent under the Loan Documents to Plaintiff MAA. *See* ECF No. 89, at p. 9, n. 2; Amended Co-Lenders Agreement, attached as Exhibit X to Plaintiffs motion for summary judgment.

bankruptcy claims had been equitably tolled, and whether plaintiff engaged in "inexcusable delay" in bringing the action such that laches should bar relief. ECF No. 79.[8]

On November 1, 2013, Guarantors filed an answer to the FAC, along with four counterclaims against Trustee and five crossclaims against Kennedy and the individual Wolfer Defendants. As to the counterclaims, on June 30, 2014, this Court dismissed under 12(b)(6) Counterclaims 1-3 (Fraud, Negligent Misrepresentation, and Breach of the Modification Contract).[9] The Court reasoned that Guarantors failed to allege damages, a necessary element of all three claims. Guarantors' Cross-Complaint against Kennedy and the individual Wolfers alleged the same four claims as the Guarantors' Counter-Complaint, except that it added a fifth Crossclaim for indemnification. As discussed below, the individual Wolfer Defendants now move to dismiss the five Crossclaims for failure to establish alter ego liability.

The Second Amended Complaint ("SAC"), filed January 19, 2014, makes the following claims. Count I alleges that Kennedy and Guarantors violated the automatic stay provision of federal bankruptcy code and requests that the Court void the Modification pursuant to 11 U.S.C. § 362(a)(3). Counts 2 and 3 allege that Clearwater is in breach of the Loan Agreement. Count 4 seeks avoidance of postpetition transfer pursuant to § 549 of the federal bankruptcy code. Count 5 alleges that Kennedy violated the Co-Lenders Agreement by modifying the Loan without Trustee's consent. Count 6 asserts that, even if the Modification is valid, Kennedy violated the CLA by failing to distribute Trustee's 43.53% share of the $500,000 paid by Guarantors under the Modification. Counts 7 through 11 assert alternate theories of vindicating KD8's right to its share of the Guarantor's $500,000 payment to Kennedy. All of Plaintiff's claims against the individual Wolfer Defendants were dismissed with prejudice pursuant to a Stipulation dated January 27, 2014.[10]

Defendant Guarantors assert crossclaims against Kennedy and the individual Wolfer Defendants for fraud, negligent misrepresentation, breach of contract, declaratory relief, and indemnification. Guarantors argue that, if the Modification is deemed invalid in light of the CLA's consent provision, Kennedy committed fraud by misrepresenting to Guarantors that Kennedy had obtained necessary consent from the other lenders, and that Guarantors should be indemnified as to claims filed by Trustee.

---

[8] Judge Cavanaugh also rejected the Defendants' assertion that KD8 was not party to the Loan Documents and that it thus lacked standing to sue Guarantors for breach. Judge Cavanaugh held that the Trustee adequately pleaded facts showing that KD8 was a "partially disclosed principal" under the Loan Agreement; in other words, Guarantors knew there would be Co-Lenders despite not knowing their exact identity. ECF No. 79, at 9.
[9] Count 4, seeking declaratory relief that the Modification is invalid, was not addressed.
[10] *See supra* n. 7 and accompanying text.

### G. Pending Motions

Plaintiff Trustee and Defendant Guarantors each move for summary judgment on Trustee's contract and bankruptcy claims. Guarantors move to strike two allegedly "sham" declarations submitted in support of Trustee's motion for summary judgment. Lastly, Kevin, Jeffrey and Gregg Wolfer move to dismiss all of Guarantors' crossclaims against the Wolfers as individuals, arguing that the record does not support alter ego liability.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.2d 641, 647 (3d Cir. 2007).

## III. DISCUSSION

### A. Guarantors' Motion to Strike Plaintiff's "Sham" Declarations

On August 31, 2016, Trustee submitted declarations of Trustee Ronald Peterson and Daniel F. Dooley in support of Plaintiff's motion for summary judgment. Neither declaration introduces new material facts into the record. The Peterson Declaration reiterates deposition testimony that Peterson was unaware of the Modification and release until August 2011. Mr. Dooley's Declaration, submitted on behalf of Plaintiff MAA as successor to KD8, restates basic facts about the action which are known to all parties. Guarantors move to strike the Declarations on the grounds that discovery is over, that the Peterson Declaration is internally inconsistent and contradicts previous testimony given during Peterson's deposition, and that Mr. Dooley was not listed as a witness in initial disclosures or discovery. These objections are baseless; the motion to strike is **DENIED**.

Courts occasionally strike "sham" affidavits in order to protect the integrity of Rule 56 proceedings. The purpose of the "sham affidavit doctrine" is to prevent a party from defeating summary judgment "by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 251 (3d Cir. 2007) (quoting *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)). An affidavit or declaration is considered a "sham" if it (1) contradicts the affiant's prior testimony and (b) there is no valid explanation for the

inconsistency. *Baer*, 392 F.3d at 624. The doctrine is used sparingly, because a court's role at summary judgment "is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Jiminez*, 503 F.3d at 253. "When there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." *Baer*, 392 F.3d at 625. *See also Crawford v. George & Lynch, Inc.*, 19 F.Supp.3d 546, 557 (D. Del. 2013).

The Peterson Declaration is not a sham. There are no clear inconsistencies between Peterson's deposition testimony and his declaration in support of summary judgment. At both times, Peterson claimed to have learned of the Modification and release no earlier than August 2011. Deposition Transcript of Ronald R. Peterson ("Dep. T. Peterson"), 77:2-13. *See Crawford*, 19 F.Supp.3d at 557; *Hamill v. North Wildwood City*, 2013 WL 1007297, at *9 (March 11, 2013). That the Peterson Declaration contradicts testimony and circumstantial evidence submitted by an adverse party is no reason to strike Peterson's Declaration; that is simply an indication that material questions of fact may exist.

As for the Dooley Declaration, Defendants argue that Dooley "was never deposed, was never listed as a witness in initial disclosures or discovery, and nonetheless has sworn to facts in his declaration . . . that were in turn never disclosed in discovery." Defs.' Mot. to Strike, at 1. Yet Defendants do not refer to any facts contained in the Dooley Declaration that were not already contained in the record. Indeed, Dooley's three-page Declaration contains virtually no facts at all; it serves ostensibly to identify Dooley as a manager of Plaintiff MAA. The Court **DENIES** Defendants' motion to strike the Declarations of Peterson and Dooley.

### B. Plaintiff Trustee's Contract Claims (Counts 2, 3, 5-11)

i. Plaintiff Trustee's Standing to Sue under the Loan Documents

Plaintiff Trustee asserts that the Modification is void because Kennedy lacked authority to modify the Loan, in which case Guarantors remain bound by the original $23 million guaranty. Guarantors respond that, under the Loan Agreement, Kennedy only needed consent of Lenders holding 50% outstanding interest in the Loan in order to modify the Loan Documents. *See* Brackmann Decl. Ex. 1, Loan Agreement § 20(d). Further, Guarantors argue that Trustee/KD8 lacks standing to sue under the Loan Documents because the only counterparty or lender named in the Loan Documents was Kennedy; and, although the Guaranty stated Kennedy was acting as "agent for lenders identified in Schedule D," it is undisputed that Schedule D was left blank and was never amended. Defendants attempt to underscore the lack of privity between Clearwater and KD8 by pointing out that KD8 did not even exist when the Loan Agreement was executed. An alternative inference would be that KD8 was created for the very purpose of participating in the Loan Agreement.

Whether Trustee has standing to sue under the terms of the Guaranty is a matter of contract interpretation. The Court's focus when interpreting contracts is "to ascertain the intention of the parties at the time the agreement was executed." *Laplace v. Laplace*, 2006 WL 83110, at *5 (D.N.J. Jan. 12, 2006), *aff'd sub nom. Laplace v. Estate of Laplace ex rel. Laplace*, 220 F. App'x 69 (3d Cir. 2007) (citing 11 Williston on Contracts § 32:2 (4th ed.) (hereinafter "Williston")); *McNeilab, Inc. v. N. River Ins. Co.*, 645 F. Supp. 525, 544 (D.N.J. 1986) ("All rules as to the interpretation of ambiguities must be subordinated to the common intent of the parties which governs."). Judicial interpretation should give reasonable and effective meaning to all parts of a contract. Williston § 32:11.

Notwithstanding Kennedy's failure to amend Schedule D, the Guarantors understood when executing the original Loan Documents that other lenders would be participating and that Kennedy would have the power to determine who those lenders would be. Guarantors were admittedly aware during the life of the Loan that Kennedy was not the only lender, *see* Depo. of Russ Hatle 28:19-24. Indeed, the Loan Documents define "Lender" as "Agent and lenders . . . collectively." Brackmann Ex. 1. This language takes on greater importance given that **the Loan Documents give Kennedy the power to unilaterally add lenders and agents**. *See* CLA ¶ 13 ("Lender shall have the right to sell, assign, participate, transfer or dispose of all or any part of its interest in the Loan without the consent or approval of Borrower or Guarantor."). Kennedy exercised this right when it assigned KD8 43.53% interest in the Loan upon executing the CLA.[11] As part of the collective "Lender" in the Clearwater loan, Trustee has standing to sue Guarantors for breach of the Loan Agreement and Guaranty.[12] Language elsewhere in the Loan Documents indicates the parties' mutual understanding that future lenders and/or agents could become party to the Loan Documents without the consent of either the Guarantors or Clearwater. *See* Guaranty § 7 ("Each reference herein to Lender shall be deemed to include its successors and assigns, in whose favor the provisions of this Guaranty shall also inure."); Loan Agreement § 20(h) ("Without the consent of, or notice to Borrower, Lender may add one or more additional co-agents to this Loan").

ii. <u>Contract Claims Against Guarantors (Counts 2 and 3)</u>

Trustee claims that Guarantors breached the Loan Agreement by entering into the Modification and releasing Guarantors from their $23 million obligation. Trustee argues that, because Kennedy lacked authority under the Co-Lenders Agreement to modify the Loan, the Modification is invalid and the Guaranty remains in effect. In addition to arguing that Trustee/KD8 lacks requisite privity to sue for breach, Guarantors respond that Section

---

[11] Paragraph 11 of the Co-Lenders Agreement states that "Schedule D to the Loan Agreement . . . shall be amended and restated to specifically set forth the Lender's Percentage of each Lender which holds a portion of the Loan." Brackmann Decl. Ex. 4.

[12] Judge Zagel of the Northern District of Illinois and Judge Cavanaugh of the District of New Jersey both found that KD8 has standing to sue under the Loan Documents since it was part of the collective "Lender" as defined in that set of documents. ECF No. 39 at 3-4; ECF No. 79 at 9.

20(d) of the Loan Agreement allows Kennedy to modify the agreement with the consent of 50% of the Lenders, which it obtained before signing the Modification.

Although the Court finds that KD8 is effectively a party to the Loan Documents (as part of the collective "lender"), the terms of the Loan Agreement did not require Kennedy to obtain KD8's consent before signing the Modification. Brackmann Decl. Ex. 1 § 20(d). The Loan Agreement unambiguously authorizes Kennedy to modify the Guaranty with only 50% of Co-Lenders consenting. Weeks later, Kennedy executed the CLA, which requires unanimous consent of Co-Lenders (including KD8) to modify the agreement. Guarantors were not party to the CLA, so Trustee sues Guarantors for breach only under the original Loan Documents.

Trustee also argues that Guarantors failed under the terms of the Modification to satisfy conditions precedent to the release of Guarantor obligations.[13] Trustee further alleges that Guarantors ceased maintaining the property early in 2010—well before the April 30, 2011 end of the Maintenance Term—and that the property consequently fell into disrepair. *See, e.g.*, Peterson Depo. 108:10-110:5. Jeffrey Wolfer, president of Kennedy from 2005 to 2011, agreed that the "the property was not maintained." J. Wolfer Dep., at 112-113. As a result, Trustee argues, conditions precedent to releasing Guarantors were not met.

The question the Court must answer is whether Guarantors materially breached the Modification or substantially performed. Under New Jersey law,[14] a material breach is one that "goes to the 'essence' of the contract," thereby excusing the counterparty from performance. *Peek v. Johl & Co. Inc.*, 2012 WL 6115678, at *4 (N.J. Super. Ct. App. Div. Dec. 11, 2012) (quoting *Ross Sys. V. Linde-Dari-Delite, Inc.*, 35 N.J. 329, 341 (1961)). "The doctrine of substantial performance allows one who has performed in good faith, though making some slight omissions or deviations from the letter of the contract[,] ... to recover." *Id.*

The "essence" of Guarantors' promise under the Modification was to maintain the real estate (a golf course) so as to preserve the value of Trustee's collateral. Whether Guarantors met their obligation through the end of the Maintenance Term is a question of fact that the Court cannot resolve at this stage. The record does not show conclusively whether the maintenance funds were spent in a manner that conferred upon Trustee "the benefit of the bargain." *See Weisman v. New Jersey Dept. of Human Services*, 817 F.Supp.2d 456, 461 (D.N.J. 2011). If Guarantors did not substantially perform, then

---

[13] Trustee asserts that Guarantors only spent approximately $2.8 million of maintenance expenses during the term of the Maintenance Term, whereas the Modification called for expenditures of $3 million.

[14] The Court declines to apply Colorado law to interpret the Modification agreement, because, *inter alia*, the original Loan Documents were executed under New Jersey law.

releasing Guarantors from the Guaranty would grant them a windfall and compromise the "essence" of the Modification as well as the underlying Loan Documents.

A genuine dispute remains as to whether Guarantors performed under the Modification Agreement and were thus discharged from their underlying $23 million Guaranty obligation. Both competing summary judgment motions on Counts II and III are **DENIED**.

### iii. Kennedy's Breach of the Co-Lenders Agreement (Count 5)

Plaintiff Trustee alleges in Count V that Kennedy breached the Co-Lenders Agreement ("CLA"), which requires consent of *all* lenders in the event Kennedy "releases any Guarantor from its obligations in respect of any of the Loan Documents . . .." CLA § 6(e)(iv). There is no question that Kennedy violated this provision when it agreed to the Modification without Trustee's Consent.

Kennedy nonetheless maintains that the Guarantors failed to adequately maintain the property, voiding the Modification. Kennedy argues that because the original Guaranty and Loan Documents remains binding, Plaintiff has not been harmed. Plaintiff, however, moves for summary judgment only as to whether a breach of the Co-Lenders Agreement occurred. *See* Fed. R. Civ. P. 56(a). The Court **GRANTS** partial summary judgment for Trustee as to Count 5 and leaves the issue of damages for trial.

### iv. Kennedy's Failure to Distribute Proceeds (Counts 6)

Pursuant to the Modification of Guaranty ("Modification"), Guarantors agreed to pay Kennedy and the lenders $500,000 and to spend $1.5 million to maintain the collateral properties in each of the two years following commencement of performance (for a total of $3 million). In exchange, Guarantors would be released from their $23 million obligations under the Guaranty and granted an option to purchase the collateral if Kennedy foreclosed upon the property.[15] *See* Brackmann Decl. Ex. 20, Option to Purchase Agreement.

The CLA states that upon receiving repayment of principal Kennedy shall pay each lender an amount in proceeds reflecting its fractional interest in the loan. Brackmann Decl. Ex. 4. Trustee alleges that Kennedy failed to pay Trustee its 43.52% interest in the $500,000 principal repayment under the Modification. Count 6 alleges that Kennedy thereby breached the CLA, and Plaintiffs move the Court to enter a judgment in the amount of $217,600.

Kennedy "acknowledges that the Plaintiff may be entitled to some portion of the payment received from the Clearwater Guarantors" but disputes the amount. Wolfers' Mem. Opp. Pls.' Mot. Summ. J., at 7. Kennedy alleges that it was entitled under the Co-

---

[15] Kennedy ultimately did not foreclose on the property.

Lenders Agreement to a setoff for advances that it made on KD8's behalf, plus interest on the advances at a rate of 25% per annum. *Id.* While Bankruptcy Code §533 recognizes a creditor's right to a setoff in certain circumstances, Kennedy provides inadequate documentation of the advances giving rise to the setoff, and does not explain its calculation. Accordingly, Plaintiff's motion for summary judgment is **GRANTED** as to Count 6.[16]

### C. Plaintiff Trustee's Bankruptcy Claims (Counts 1, 4)

Bankruptcy Code § 362 "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Section 549 states that a trustee "may avoid a transfer of property of the estate . . . that occurs after the commencement of the case[] and . . . that is not authorized by this title or by the court." 11 U.S.C. § 549(a).

Trustee asserts that Defendants Kennedy and Guarantors violated both provisions when they executed the Modification Agreement.[17] Defendants argue that (a) Trustee did not own a property interest in the Loan and Guaranty and, (b) releasing Guarantors from their Guaranty obligations was not a "transfer" for purposes of the Bankruptcy Code. These arguments fail.

    i.    <u>Trustee/KD8's property interest in the Guaranty</u>

Guarantors allege that KD8 had no direct interest in the Loan, since Kennedy was the sole lender/agent named in the Loan Agreement, and no other lenders were formally added to Schedule D. Guarantors thus could not have unlawfully transferred property of KD8's bankruptcy estate. This argument is unavailing. For all practical purposes, Trustee had a property interest in the loan regardless of whether that interest arose from the Co-Lenders Agreement or the original Loan Documents. *Cf. In re Sherlock Homes of W.D.N.Y., Inc.*, 246 B.R. 19, 25-26 (Bankr. W.D.N.Y. 2000) ("That [transfer of contract rights] was accomplished through a series of transactions can in no way diminish the occurrence of the transfer.").

    ii.    <u>The Modification as a "Transfer" of Trustee's Property</u>

The Bankruptcy Code defines "transfer" as:

(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or

---

[16] Because the Court grants summary judgment for Trustee on Count 6, alternate theories of liability under Counts 7-11 need not be addressed.

[17] KD8 and its affiliates filed for Chapter 7 Bankruptcy on October 20, 2008. The Modification was executed on July 17, 2009. Count 4, alleging an unauthorized postpetition transfer, applies only to Guarantors, not Kennedy.

13

indirect, absolute or conditional, voluntary or involuntary, of disposition of or parting with: (i) property; or (ii) an interest in property.

11 U.S.C. § 101 (54). This broad definition of "transfer" includes an agreement to release a counterparty from obligations created by an underlying contract. *See In re Teligent, Inc.*, 325 B.R. 81, 87 (Bankr. S.D.N.Y 2005) ("[P]arties can generally terminate their obligations and release each other under the terms of their original agreement. If such a release is not a transfer, it would be the rare release that would be."). Trustee's interest in the $23 guaranty obligation—whether arising directly from the Guaranty itself or from the Co-Lenders Agreement—was "transferred" when Guarantors were released by the Modification.[18]

iii. Exception for Subsequent Transferees under § 550 Does Not Apply

Notwithstanding § 549's prohibition of postpetition transfers, § 550 protects from avoidance "any immediate or mediate transferee of [the] initial transferee" if the second transferee "takes for value . . . in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. 550(a)-(b). Guarantors argue that Kennedy, as agent for Co-Lenders under the Loan Agreement, was the initial transferee, and that Guarantors were a subsequent "immediate or mediate transferee." They allege to have received the property in good faith, without knowledge of KD8's bankruptcy proceedings and in exchange for "good value" under the Modification.

The Court finds that Guarantors were the initial transferees and thus cannot take advantage of the exception in § 550 for subsequent good faith transferees. Notwithstanding the parties' failure to formally amend Schedule D of the Loan, KD8 was a participating lender with a property interest in the Loan. That interest was "transferred" to Guarantors through the release contained in the Modification.[19]

iv. Waiver of Statutes of Limitation in Guaranty

---

[18] A party need not have knowledge of the bankruptcy to violate the automatic stay under Section 362. *In re Myers*, 491 F.3d 120, 127 (3d Cir. 2007) (regardless of a party's knowledge, actions in violation of the stay are "void (as opposed to voidable)"); *Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d. Cir.1995) ("The stay is 'automatic' because it is triggered upon the filing of a bankruptcy petition regardless of whether the other parties to the stayed proceeding are aware that a petition has been filed."); *In re Brooks*, 414 B.R. 65, 69-70 (E.D. Pa 2009) ("Courts routinely hold that creditors have violated the automatic stay despite the fact that they have no knowledge of a debtor's bankruptcy.").

[19] The Court also finds that the Modification was not made "in the ordinary course of business." *See* 11 U.S.C. § 363(c)(1)(" . . . the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business . . .").

14

Because the Modification was signed July 17, 2009 and the original Complaint was filed more than two years later on April 27, 2012, Guarantors invoke the two-year statute of limitations on § 362 and § 549. 11 U.S.C. § 549(d)(1). In response, Trustee points to a provision of the Guaranty in which the Guarantors waive their right to assert "any statute of limitations affecting [] liability . . . under the Loan Documents or the enforcement hereof, to the extent permitted by law." Guaranty § 4(m). Guarantors say that such waivers are unenforceable as a matter of public policy.

Notwithstanding the public policy interests underlying statutory limitations provisions, the Court declines to void the statute-of-limitations waiver contained in the Guaranty. Plain meaning is especially authoritative in disputes between sophisticated parties. *See Feinstein v. B.D.S. Remodeling Services*, 2005 WL 704290, at *3 (Mar. 21, 2005); *Norwest Bank Minnesota v. Blair Road Assoc., L.P.*, 252 F.Supp.2d 86, 94 (D.N.J. 2003). Further, "[w]hile Defendants argue that public policy runs counter to enforcing a waiver of statute of limitations defense . . . so too is there a public policy interest in enforcing parties' contractual agreements." *Columbia Hous. SLP Corp. v. Trevor*, 2015 WL 4662507, at *4 (W.D. Pa. Aug. 6, 2015) (citations omitted). This case involves sophisticated parties represented by counsel. The waiver is specific and unambiguous. *See U.S. on Behalf of Small Bus. Admin. v. Richardson*, 889 F.2d 37, 40 (3d Cir. 1989) ("[t]he promise of the defendant not to raise the defense of the expiration of the limitations period must either be express or couched in words clearly conveying the defendant's intention not to plead the statutory bar."). *See generally In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035, 1044 (11th Cir. 2008) (noting that "§§ 546 (a) and 549(d) are waivable statutes of limitation rather than restrictions on the bankruptcy courts' subject matter jurisdiction."). Here, Guarantors unambiguously waived their right to invoke limitations provisions. As explained below, however, that does not preclude Guarantors from asserting laches.

     v.    <u>Equitable Defense of Laches</u>

Though Guarantors agreed to waive the statute-of-limitations defense, the Court has discretion to bar the Plaintiffs' claims by applying the doctrine of laches. Laches applies where a court finds (1) an inexcusable delay by the plaintiff in bringing suit, and (2) prejudice to the defendant from the delay. *Gruca v. U.S. Steel Corp.*, 495 F.2d 1252, 1258 (3d Cir. 1974). "Laches 'usually requires the kind of record only created by full trial on the merits' because 'the correct disposition of the equitable defense of laches can only be made by a close scrutiny of the particular facts and a balancing of the respective interests and equities of the parties, as well as of the general public.'" *Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509, 516 (E.D. Pa. 2007) (quoting *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1066 (3d Cir.1991)).

Whether the delay was "inexcusable" depends on when the Trustee discovered that Kennedy released Guarantors, an issue of fact very much contested by the parties. Trustee has stated repeatedly that he was unaware of the Modification until the summer of 2011. *See* Peterson Dep. 77:17-78:5. In fact, Trustee goes further: he alleges that the Wolfers

15

deliberately concealed the transaction by providing Trustee and Co-Lenders with "*just enough* information to make them believe they were 'in the know' regarding the ongoing negotiations with the Clearwater Guarantors, while, time after time, methodically concealing all documents and communications that would put them on notice of the Releases." Pl. Reply at 16. Meanwhile, Kennedy and Guarantors allege that, at the absolute latest, Trustee learned of the Modification by written notice in February 2010. *See supra* pp. 4-5. As already discussed in this Opinion, Jeffrey Wolfer testified that he discussed the Modification directly with Trustee but that he could not recall details of the conversation.

Accordingly, when Trustee became aware of (or should have become aware of) the Modification and whether Kennedy or the Guarantors deliberately concealed the Modification from Trustee are questions that require careful assessment of witness credibility. Defendants' motion for summary judgment is **DENIED** as to the issue of laches.

### D. The Wolfers' Motion to Dismiss Guarantors' Crossclaims

The individual Wolfer Defendants—Jeffrey, Kevin, and Gregg—move to dismiss all five of Guarantors' crossclaims: fraud, negligent representation, breach of contract, declaratory relief, and indemnification.[20] The Wolfers argue that Guarantors have failed to provide evidence allowing a reasonable factfinder to find alter ego liability.[21] The Court **DENIES** the Wolfers' motion for summary judgment because questions of material fact remain as to whether Kennedy was an alter ego of the Wolfers and the Wolfers are not entitled to judgment as a matter of law.

"[A] primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 387 N.J. Super. 160, 198, 903 A.2d 475, 497 (App. Div. 2006). Courts, however, may "pierce the corporate veil"— expose individual shareholders to liability—in order "to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law. . .."" *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002) (citing *State Dep't of Envtl. Protect. v. Ventron Corp.*, 94 N.J. 473, 500, 468 A.2d 150 (1983)); *Hartford Fire Ins. Co. v. Conestoga Title Ins. Co.*, 746 A.2d 460, 461–62 (N.J. App. Div. 2000) ("[A] court of equity is always concerned with substance and not merely form, and thus, it will go behind the corporate form where necessary to do justice."). "While the corporate

---

[20] The crossclaims were asserted in Guarantors' answer to the FAC, then incorporated by reference in Guarantors' answer to the SAC. *See* ECF. No. 119, at n.1.

[21] Again, only Plaintiffs—not the Guarantors—stipulated to dismissal with prejudice of all claims asserted against the individual Wolfer Defendants, pursuant to Fed R. Civ. P. 41(a)(1)(A)(ii). ECF No. 99. That stipulation stated that "nothing herein shall impair the crossclaims asserted by the Clearwater Guarantors against the Wolfer Defendants in this action." *Id.* The Guarantors' crossclaims against the individual Wolfers thus remain pending and are now subject to the Wolfers' motion for summary judgment.

veil is usually pierced in the parent-subsidiary context, courts may also pierce to reach individual owners, shareholders, or corporate officers." *Prime Capital Grp., Inc. v. Klein*, 2008 WL 2945966, at *8 (D.N.J. July 29, 2008).

"In order to pierce the corporate veil in New Jersey, a plaintiff must establish that (1) the shareholder or parent so dominated the corporation or subsidiary that the two entities did not have a separate existence and (2) the shareholder or parent used the corporation . . . 'to perpetrate a fraud or injustice, or otherwise to circumvent the law.'" *Prime Capital Grp., Inc.*, WL 2945966 at * 8. *See Walter v. Holiday Inns, Inc.*, 784 F. Supp. 1159, 1165 (D.N.J. 1992), aff'd, 985 F.2d 1232 (3d Cir. 1993) "The issue of piercing the corporate veil is submitted to the factfinder, unless there is no evidence sufficient to justify disregard of the corporate form." *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 498 (N.J. App. Div. 2006).

As for the first prong of alter ego analysis, there is sufficient evidence of "corporate dominance" to preclude summary judgment. Corporate dominance often manifests in exceedingly risky behavior and failure to adhere to corporate formalities, evidence of which emerged during discovery in this case. *See, e.g.*, *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 498 (N.J. App. Div. 2006). A reasonable jury could find that Kennedy—as directed by the Wolfer brothers—originated and serviced economically unviable loans and attempted to shift the risk of loss to other parties. *See* Peterson Depo. 101:22-102:10.[22] In this particular case, Kennedy was unable to obtain funding necessary to keep the Clearwater project (among others) afloat, and decided to terminate its loan originating business altogether in 2011. *See* K. Wolfer Depo. 50:6-7.

A strong indication of alter ego liability is Kennedy's alleged disregard of corporate formalities, coupled with the Wolfers' complete ownership and management of the corporation.[23] Kennedy never held formal shareholder meetings or took minutes. Instead, the Wolfer brothers met casually for informal discussions on a day-to-day basis. Kevin Wolfer Depo. 52:1-9. *See Sec. & Exch. Comm'n v. Cooper,* 142 F. Supp. 3d 302, 318 (D.N.J. 2015) ("They never held a single board or executive meeting . . ."). At deposition, Kevin Wolfer appeared unfamiliar with the concept of "corporate governance." *See* K. Wolfer Depo. 51:21-23. Although Gregg Wolfer remains a 50% shareholder, Kevin was unaware of Gregg's title in the company. *Id.* at 10:1-4 ("He has some title . . . I'm not sure what it is."). Indeed, Kevin could not recall the additional titles he himself held at Kennedy other than CEO. *Id.* at 14:6-8. When deposed, Jeffrey Wolfer, former CEO and President of Kennedy, could not recall whether Kennedy had established guidelines for

---

[22] In 2011, Kennedy ceased originating loans and "broke apart" the company." K. Wolfer Depo. 50:6-7. Between 2005 and 2011, Kennedy employed roughly 40 people. *See* J. Wolfer Depo. At 12:7-11.

[23] Today, Kevin and Gregg Wolfer each own 50% of Kennedy. See, e.g., In re Buildings by Jamie, Inc., 230 B.R. 36, 42 (Bankr. D.N.J. 1998).

communicating with co-Lenders. *See* Jeffrey Wolfer Depo. 107:4-5. Former Kennedy employee Matthew Cole was asked during deposition how long he acted as loan originator for Kennedy; his response: "It's hard to say, because we were very loosely organized." Cole Depo. 9:5-6, 9:14-16. Finally, the brothers continued at all relevant times to discuss corporate business dealings with their father, Joseph Wolfer, who founded Kennedy in 1990 and who purportedly retired in the mid-2000s. *See* K. Wolfer Depo. 52:1-11. Interestingly, JKG (owning 2% of the Loan), controlled by Joseph Wolfer, was among the co-Lenders who consented to the Modification. This further suggests that Kennedy Funding merely operated as a veil for the Wolfers' personal business dealings.

As to the second element of alter ego liability, a reasonable factfinder could conclude that the Wolfers exploited the corporate entity to "perpetuate . . . injustice, or otherwise to circumvent the law," and to advance their personal business interests at the expense of others. *Prime Capital Grp., Inc.*, WL 2945966 at * 8. In the case of the Clearwater Loan, Kennedy blatantly breached the CLA by releasing the Guarantors from the underlying Loan Documents without the consent of all the lenders. Given the arguably meager consideration given by the Guarantors in return for releasing their $23 million Guaranty obligation, it is quite plausible that the Trustee would have exercised his right under the CLA to withhold consent and prevent the Modification and Release from execution. Supported by email correspondence now in the record, Guarantors allege that the Wolfers misled Guarantors into believing that Kennedy *had* obtained consent to execute the Modification, when in fact they had not. Even assuming, as the Wolfers argue, that Guarantors cannot prove damages requisite for fraud, negligent misrepresentation, or breach, disposition of Guarantors' indemnification claim (Crossclaim 5) rests on unresolved issues of material fact (Count 5).[24]

Although indemnification is generally made explicit in writing, New Jersey courts also recognize an equitable doctrine of common law indemnity. *Promaulayko v. Johns Manville Sales Corp.,* 562 A.2d 202, 205 (N.J. 1989) ("In the absence of an express agreement between them, allocation of the risk of loss between the parties in the chain of distribution is achieved through common-law indemnity, an equitable doctrine that allows a court to shift the cost from one tortfeasor to another."). *See Ramos v. Browning Ferris Indus. of S. Jersey, Inc.*, 190 510 A.2d 1152, 1159 (1986). ("[O]ne who in good faith and at the direction of another commits a tort is allowed indemnity against the person who caused him to act."). Whether common law indemnity applies in this case depends on genuine disputes of material fact, such as whether and to what extent the Guarantors were aware of the CLA's consent provision and of Kennedy's failure to obtain Trustee's consent.

---

[24] On June 30, 2014, the Court dismissed counterclaims by Guarantors against Plaintiff Trustee and KD8 for fraud, misrepresentation, and breach of contract, reasoning that Guarantors could not prove damages. ECF No. 110. Dismissal, however, was without prejudice. Further, with the benefit of discovery, the Court now sits before a materially different record than in June 2014.

In sum, the Court **DENIES** the Wolfers' motion for summary judgment dismissing Guarantors crossclaims, because unanswered questions of material fact remain as to the issue of the Wolfers' alter ego liability. If Kennedy is found liable for certain unlawful corporate acts at trial, the Wolfer brothers may face significant individual liability. The Court's holding applies equally to all five of Guarantors' crossclaims, which depend on the same factual disputes described throughout this Opinion, the resolution of which shall be determined at trial.

## IV.    CONCLUSION

Defendants' motion to strike the declarations of Daniel Dooley and Ronald R. Peterson is **DENIED**.

Plaintiffs' motion for summary judgment is **GRANTED in part** as to Counts 5 and 6, which relate to breaches of the Co-Lenders Agreement. The issue of damages will be tried. As to Counts 7, 8, 9, 10, and 11, the motion is **DENIED as moot**.

Plaintiffs' motion for summary judgment of Counts 1, 2, 3, and 4 is **DENIED**. When Trustee learned about the release of Guarantors and whether the Guarantors substantially performed under the Modification are issues about which reasonable factfinders could disagree.

Defendant Guarantors' motion for summary judgment is **DENIED**.

The Wolfers' motion for summary judgment is **DENIED**.


      /s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**


**May 8, 2017**